# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. ROMARCUS ECHOLS

**Appeal from the Criminal Court for Shelby County**
**No. 12-00513      W. Mark Ward, Judge**

_____

**No. W2013-01758-CCA-R3-CD  - Filed January 12, 2015**

_____

A jury convicted the Defendant, Romarcus Echols, of especially aggravated kidnapping, especially aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony.  The trial court imposed an effective sentence of 60 years. The sentences for especially aggravated kidnapping, especially aggravated robbery, and employing a firearm during the commission of a dangerous felony were ordered to be served consecutively with each other, but concurrently with his sentence for aggravated burglary. The Defendant raises three issues on direct appeal: (1) whether the trial court erred when it instructed the jury that especially aggravated kidnapping as charged in this case could be the predicate felony for employing a firearm during the commission of a dangerous felony; (2) whether there was sufficient evidence to support the Defendant's conviction for especially aggravated kidnapping; and (3) whether the trial court abused its discretion by ordering consecutive sentences.  Upon review of the record and applicable law, we affirm the judgments for especially aggravated kidnapping, especially aggravated robbery, and aggravated burglary, but reverse the judgment for employing a firearm during the commission of a dangerous felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Affirmed in Part and Reversed in Part**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Stephen Bush, District Public Defender; Amy Mayne and Nick Cloud, Assistant Public Defenders (at trial); and Tony N. Brayton, Assistant Public Defender (on appeal), Memphis, Tennessee, for the appellant, Romarcus Echols.

Robert E. Cooper, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Betsey Wiseman and Meghan Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Following a jury trial, Romarcus Echols ("the Defendant") was convicted and sentenced for the following offenses:

| Count | Charge | Verdict | Sentence |
|-------|--------|---------|----------|
| 1 | Especially Aggravated Kidnapping | Guilty | 25 years |
| 2 | Especially Aggravated Robbery | Guilty | 25 years |
| 3 | Aggravated Burglary | Guilty | 6 years |
| 4 | Employing a Firearm During the Commission of a Dangerous Felony | Guilty | 10 years |
| 5 | Convicted Felon in Possession of a Handgun | Not Guilty | N/A |

The trial court ordered consecutive sentences for Counts 1, 2, and 4, all to be served concurrently with Count 3, for a total effective sentence of 60 years in the Department of Correction. Upon review of the record and applicable law, we affirm the Defendant's conviction for especially aggravated kidnapping and sentence, but we reverse the Defendant's conviction for employing a firearm during the commission of a dangerous felony.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Trial

Cedric Crawford, the victim, testified that he had lived on Benning Street for about 40 years at the time of the offense and the Defendant lived next door. About 11:00 a.m. on September 15, 2011, Mr. Crawford left his house to go to the grocery store to buy cigars. Earlier that morning, Mr. Crawford had seen an individual he did not recognize walking up and down the street. He described the individual as a young, black man about five feet, nine

inches tall. When Mr. Crawford left for the store, the individual was standing in the Defendant's driveway and speaking with the Defendant.

About ten minutes later, Mr. Crawford returned from the store. As he approached his back door, Mr. Crawford heard someone yell, "Freeze." When he turned around, Mr. Crawford saw the Defendant running toward him with a sawed off shotgun pointed at his face. Another man stepped out from behind the garage, holding a shotgun. Both men were wearing black masks that covered half of their faces, but Mr. Crawford could see a part of each man's nose, eyes, and forehead. He stated that he immediately identified the Defendant as the person who ran at him with the shotgun because the Defendant was the shortest person in the neighborhood.

Both men forced Mr. Crawford into his house, through the kitchen and dining room, and made him lie face-down on the living room floor. The accomplice then tied up Mr. Crawford's hands with an orange extension cord. They demanded money from Mr. Crawford, but Mr. Crawford told them he did not have any. The Defendant then stated, "Rick, I [sic] going to sure feel sorry for you if you don't have any money" because the accomplice would beat Mr. Crawford. Mr. Crawford stated that he went by "Rick" in the neighborhood, and when he heard the Defendant call him "Rick," Mr. Crawford recognized the Defendant's voice. Mr. Crawford then told them that he had money is his pocket as well as under his mattress. The Defendant went to retrieve the money from under the mattress, and the accomplice took the money from Mr. Crawford's pocket.

While the Defendant searched the bedroom, the accomplice was lying on top of Mr. Crawford in the living room. While in this position, the accomplice took a box cutter and very slowly cut Mr. Crawford's neck from one side to the other and then held the box cutter to Mr. Crawford's throat. Mr. Crawford stated that the Defendant must have seen this because he said, "Don't do that," but the accomplice told the Defendant to keep searching Mr. Crawford's bedroom.

After they had searched Mr. Crawford's house, the Defendant and the accomplice took Mr. Crawford's keys and left. As they were leaving, they told Mr. Crawford not to get up until he heard the truck leave, or they would kill him. Then they left with Mr. Crawford's money, keys, truck, wallet, and cell phone. When Mr. Crawford heard the truck leave, he freed himself from the extension cord and retrieved some paper towels from the kitchen to stop the bleeding from his neck. He then went to Vernice Neely's house and called the police and an ambulance.

While in Ms. Neely's living room, Mr. Crawford told the police what happened and identified the Defendant as one of the men involved. He also identified the Defendant from a photo lineup a few days later at the police department. When asked how certain he was that the Defendant was one of the people involved in this incident, Mr. Crawford responded that he was "a hundred percent sure."

On cross-examination, Mr. Crawford said the accomplice was telling the Defendant what do to during the offense. Mr. Crawford further stated that he did not have any drugs in his house. On re-direct examination, Mr. Crawford clarified that he recognized the Defendant's stature when he saw him outside the house, but he did not recognize the Defendant's voice until the Defendant called him "Rick."

Vernice Neely testified that she lived two houses away from Mr. Crawford. On September 15, 2011, Ms. Neely observed a young man she did not recognize walking up and down the street in the neighborhood. She later saw him talking to the Defendant outside the Defendant's home. About two hours later, Mr. Crawford appeared at her door, bleeding from his neck. Ms. Neely let him in her home and called an ambulance. She also gave Mr. Crawford a white towel to help soak up the blood.

Officer Laquaria Chism of the Memphis Police Department testified that she responded to a wounded party call on Benning Street at 11:33 a.m. on September 15, 2011. When she arrived at Ms. Neely's house, she saw Mr. Crawford sitting in the living room with bloody, white material held to his neck. When she examined the wound, Officer Chism could see that Mr. Crawford's neck had been cut from one side to the other. She stated that Mr. Crawford appeared to be calm and confused, as if he was in shock. When Officer Chism asked him to explain what happened, Mr. Crawford stated that he was coming out of his house when two males approached him with sawed off shotguns. They forced him to lie face down on the ground. Then they made him get up and go back into his residence. They made him lie on the floor, and they tied him up with an orange extension cord. The men demanded money, but when Mr. Crawford said he did not have any, one of the men cut his throat. Mr. Crawford told her that he recognized one of the assailants as the Defendant. The men found some money in one of the bedrooms, took Mr. Crawford's keys and truck, and left.

Officer Charles Cathey of the Memphis Police Department Crime Scene Investigation Unit testified that he photographed Mr. Crawford's house after the incident. Officer Cathey observed what appeared to be blood on the kitchen floor, the living room rug, and on the couch. He also found an orange extension cord in the living room. Additionally, he saw what appeared to be blood along the walkway outside the backdoor of the house. The house appeared to have been "ransacked" or as if there had been a fight.

Latoya Boswell testified that she had previously dated the Defendant and they lived together at her home on Benning Street from the summer of 2010 until he was arrested in September 2011. The day after the robbery, the Defendant's uncle called their house and spoke with the Defendant. After the Defendant hung up the phone, Ms. Boswell asked him what the call had been about. The Defendant told her that his uncle had asked whether Ms. Boswell and the Defendant were involved in the robbery of Mr. Crawford. Ms. Boswell then asked the Defendant whether he committed the robbery, and the Defendant admitted that he did.

Over the next few days, the Defendant explained to Ms. Boswell why and how he committed the robbery. He told Ms. Boswell that Mr. Crawford had money and drugs in his house, and the Defendant "needed that." He stated that he and his cousin, Johnny,[1] sat in a car that was parked in Ms. Boswell's backyard, waiting for Mr. Crawford to return to his house. When Mr. Crawford arrived, the Defendant and Johnny rushed toward Mr. Crawford's house, forced him inside, and tied him up while they searched the house for money and drugs. Afterward, they left in Mr. Crawford's truck.

Ms. Boswell received several letters from the Defendant while he was in jail following his arrest.[2] Ms. Boswell read several of the letters to the jury. In those letters, the Defendant asked Ms. Boswell to assist him in several plans to prevent Mr. Crawford from testifying at his preliminary hearing. First, the Defendant asked Ms. Boswell to have one of the Defendant's cousins call Mr. Crawford and threaten to kill him if he testified at the preliminary hearing. With this letter, he sent Ms. Boswell a script of what the caller should say. In another letter the Defendant instructed Ms. Boswell to call the crime stoppers hotline and tell them that Mr. Crawford was selling drugs out of his home and that his customers were harassing Ms. Boswell and her children. The Defendant told Ms. Boswell to call the hotline at least twice a week until the police began to investigate her claims. The Defendant hoped that, if Mr. Crawford was arrested for dealing drugs, he would be unavailable to testify against the Defendant or his credibility would be impeached.

The Defendant also sent Ms. Boswell instructions for implementing two different "backup" plans to prevent Mr. Crawford from testifying. First, the Defendant told Ms. Boswell to have one her friends call the police and tell them that she had been kidnapped and robbed by a man matching Mr. Crawford's description. Second, after the Defendant realized that an allegation that Mr. Crawford had kidnapped and robbed someone would be investigated by the same police who had investigated the Defendant's case, the Defendant instructed Ms. Boswell to have her friend tell the police that Mr. Crawford had abducted and raped her. In both plans, the Defendant instructed the caller to give the police Mr. Crawford's license tag number. The Defendant also included detailed scripts of what the caller should say with each of these plans.

Finally, the Defendant wrote a letter to Ms. Boswell instructing her to tell Johnny to "erase" Mr. Crawford before the Defendant's preliminary hearing. The Defendant told Ms.

---

[1] Many individuals are identified in the record only by their first names. Therefore, we must refer to them by their first names in this opinion. We intend no disrespect.

[2] In a hearing outside the presence of the jury, Ms. Boswell was able to identify the handwriting in the letters as the Defendant's. Some of the letters were dated while others were not. Ms. Boswell could not recall the exact dates she received the letters, but she started receiving the letters shortly after the Defendant was incarcerated in September 2011, and she stopped receiving letters in January 2012.

Boswell to lie to Johnny and tell him that the Defendant would "pay whatever it takes to make him pull that trigger before my preliminary hearing." If Johnny failed to "finish the job and g[e]t rid of dude" before the preliminary hearing, then the Defendant stated that he would tell the police that Johnny was his accomplice in the robbery. The Defendant also gave Ms. Boswell passwords she was to use to inform him whether Johnny had decided to kill Mr. Crawford and whether the task had been completed. The Defendant begged Ms. Boswell to make sure Johnny completed the task. Additionally, he told her, "[T]ell my cousin to use the same method we used the first time, but this time take him out and get the f*** off the scene."

With this last letter, Ms. Boswell also received a letter addressed to Johnny. It contained substantially the same information the Defendant wrote to her regarding his request that Johnny "erase" Mr. Crawford. Additionally, the Defendant told Johnny how he should approach Mr. Crawford's house so that no one would see him. He also told Johnny the best time of day to complete the task and where Johnny should park his car to get away. If Johnny completed the task, the Defendant promised to pay him $2,000. After she finished reading both the letters, Ms. Boswell confirmed that the Defendant was instructing Johnny to murder Mr. Crawford.

Ms. Boswell testified that she never followed through with the Defendant's instructions. She further stated that none of the allegations the Defendant wanted to make against Mr. Crawford were true. She explained that she had no intention of asking someone to lie about Mr. Crawford to help the Defendant. Instead, she intentionally led the Defendant to believe that she intended to help him because she wanted to deceive him. She stated that she told her friend Judy[3] about the Defendant's plan to frame Mr. Crawford for rape, and they "had a really good laugh from it." However, she did not tell anyone else about the Defendant's requests.

Additionally, Ms. Boswell stated that she received two threatening letters from the Defendant. In the second letter, the Defendant stated:

> I know that I said that your time would be expired on 12/26/11, but yes, I have decided to expand your time limit, so that maybe one day you will come to your senses and quick because if you don't, know this, you are running off of borrowed time, says the man that holds you [sic] clock, tick tock, tick tock.

In this letter, the Defendant also said that he hoped God would bless her family because their lives would be ruined because "their not so innocent mother, daughter, decided that she

---

[3] Judy was one of the women that the Defendant requested call the police to frame Mr. Crawford for robbery, kidnapping, and rape.

wanted to play hardball with the insane schizophrenic, psychopathic side of me. So until next–until next time, Mrs. Mastermind, AKA ringleader." Ms. Boswell explained that the Defendant sent this letter after she terminated their relationship and told him that she had never intended to help him carry out the plans he detailed in his previous letters.

On cross-examination, Ms. Boswell stated that, in the first threatening letter she received from the Defendant, he threatened to expose her as the person who set up the robbery. However, she denied being involved in the robbery. She also admitted that she did not call the police when the Defendant confessed to the robbery or to tell them about the letters. She further confirmed that she gave one letter to the State in July of 2012, and she gave the State the rest of the letters one week before trial. Ms. Boswell explained that she turned over the letters when she found them. On redirect examination, Ms. Boswell stated that she gave the police the letter in which the Defendant asked Johnny to "erase" Mr. Crawford when the police contacted her in the summer of 2012.

After the close of the State's case-in-chief, the trial court granted the Defendant's motion for judgment of acquittal as to the charge of felon in possession of a handgun in Count 5. During the jury charge, the trial court gave the following instruction as to the offense of Unlawful Employment of a Firearm During the Commission of a Dangerous Felony:

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the defendant employed a firearm; and (2) that the employment was during the commission of or attempt to commit [e]specially aggravated kidnapping or aggravated burglary[;] and (3) that the defendant acted either intentionally, knowingly, or recklessly. In determining whether the firearm was employed in the commission of a dangerous felony, (element 2 above) the jury must unanimously agree on the dangerous felony committed; i.e. either especially aggravated kidnapping or aggravated burglary.

After deliberations, the jury found the Defendant guilty of all remaining charges.

### B. Sentencing Hearing

During the sentencing hearing, the Defendant read a letter he had written for the trial court into the record. In that letter, he admitted his guilt for the robbery of Mr. Crawford and appealed to religion to ask the judge to grant him mercy. He stated that he had changed since his arrest, that he had learned his lesson, and that he did not need to be sent to the penitentiary to understand the gravity of his offense. He asked the court to give him another chance and grant him time served.[4]

---

[4] At the time of the sentencing hearing, the Defendant had been incarcerated for 20 months.

Regarding the facts of the offense, the trial court noted that taunting the victim and cutting his neck was "absolutely atrocious and not necessary," and even though the accomplice was the direct actor, the Defendant was criminally responsible for the accomplice's actions. While the trial court noted that the Defendant tried to stop his accomplice from injuring Mr. Crawford, the Defendant's actions did not amount to showing remorse. Moreover, the trial court stated that it did not find the Defendant's testimony from the sentencing hearing to be a credible expression of remorse. After consideration of enhancing and mitigating factors, the trial court found that the Defendant was on probation at the time of the offense, and the presentence report indicated that the Defendant was adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. The trial court also found that the Defendant was a dangerous offender whose behavior indicated little to no regard for human life and he demonstrated no hesitation in committing the crime when the risk to human life was high. Finally, the trial court found that the Defendant was not amenable to correction. Based on these factors, the court ordered the sentences for Counts 1, 2, and 4 to run consecutively to each other but concurrently with the sentence for Count 3, for a total effective sentence of 60 years at 100%.

The Defendant subsequently filed a motion for new trial, which was denied. This timely appeal followed.

## II. ANALYSIS

### A. Jury Instruction

On appeal, the Defendant argues that the trial court erred when it instructed the jury that especially aggravated kidnapping could serve as the predicate felony for the Defendant's conviction for employing a firearm during the commission of a dangerous felony. The Defendant contends that this instruction was contrary to Tennessee Code Annotated section 39-17-1324 because possession or use of a firearm is an essential element of especially aggravated kidnapping as charged in this case. The State agrees that the trial court erred in its instruction. Agreeing with both parties, we reverse the Defendant's conviction for employing a firearm during the commission of a dangerous felony and remand the issue to the trial court.[5]

The Defendant first raises this issue on appeal. Therefore, we review this issue for plain error, and we will grant relief only if the error affected a substantial right of the Defendant. Tenn. R. App. P. 36(b). Appellate courts apply the following five factor test to determine whether an error constitutes plain error:

---

[5] Additionally, the Defendant argues that the trial court erred by failing to require the State to elect which predicate offense it would rely upon for the firearm charge. However, since we reverse the Defendant's conviction on the ground that the trial court erred in its instruction to the jury, the election issue is moot.

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)) (internal quotation marks omitted).

Tennessee Code Annotate Section 39-17-1324 states, in pertinent part:

A person may not be charged with a violation of [employing a firearm during the commission of or attempt to commit a dangerous felony] if possession or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

Tenn. Code Ann. § 39-17-1324(c) (2010). As charged in this case, especially aggravated kidnapping is "false imprisonment . . . (1) [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-305(a)(1) (2010).

This Court has previously stated that, in cases where the use of a firearm was an essential element of especially aggravated kidnapping as charged in the case, that offense cannot serve as the predicate felony for a charge of employing a firearm during the commission of a dangerous felony. State v. Trutonio Yancey, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *9 (Tenn. Crim. App. Sept. 17, 2012) perm. app. denied (Tenn. Jan. 14, 2013). This Court further explained that "including especially aggravated kidnapping as a possible underlying felony supporting the firearm charge create[s] the possibility of the jury convicting the [defendant] of a nonexistent crime . . . . Accordingly, we conclude that review of the issue is necessary to do substantial justice." Id. (internal citations and quotation marks omitted).

In this case, especially aggravated kidnapping was charged as a false imprisonment accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-305(a)(1) (2010). The record clearly establishes that the trial court instructed the jury that it could use either especially aggravated kidnapping or aggravated burglary as the predicate felony for the charge of employing a firearm during the commission of a dangerous offense–the jury only needed to be unanimous about which predicate felony it chose. This instruction obviously contradicts the language of Tennessee Code Annotated section 39-17-1324(c) in that it allowed the jury to use especially aggravated kidnapping as the predicate felony. A

substantial right of the Defendant was adversely affected because it is possible that the jury convicted the Defendant of a "nonexistent crime." See Trutonio Yancey, 2012 WL 4057369, at *9. There is no indication that the Defendant waived the issue for tactical reasons, and as noted above, consideration of the issue is "necessary to do substantial justice."

Therefore, we conclude that the trial court committed plain error by instructing the jury that especially aggravated kidnapping as charged in this case could serve as the predicate felony for the charge of employing a firearm during the commission of a dangerous felony, and we reverse the Defendant's conviction for Count 4.[6]

## B. Especially Aggravated Kidnapping Conviction

The Defendant argues that the evidence was insufficient to support his conviction for especially aggravated kidnapping. Specifically, the Defendant contends that the State failed to prove that the removal or confinement of the victim had criminal significance beyond that necessary to consummate the especially aggravated robbery. The State argues that the evidence was sufficient to support a separate conviction for especially aggravated kidnapping. We agree with the State.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. Bland, 958 S.W.2d at 659; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This Court will not

---

[6] Since this is the only charge we remand to the trial court and Tennessee Code Annotated section 39-17-1324(d) requires that the offense of employing a firearm during the commission of a dangerous felony "shall be . . . tried before the same jury and at the same time as the dangerous felony," we note that the State likely will not be able to retry the Defendant on the firearm charge without violating the statute. See Tenn. Code Ann. § 39-17-1324(d); State v. Willie Duncan, No. W2013-02554-CCA-R3-CD, 2014 WL 4243746, at *10 n.1 (Tenn. Crim. App. Aug. 27, 2014).

reweigh the evidence. Cabbage, 571 S.W.2d at 835. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As we noted above, especially aggravated kidnapping, as charged in this case, "is false imprisonment . . . : (1) [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-305(a)(1) (2010). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2010).

In State v. White, 362 S.W.3d 559 (Tenn. 2012), the Tennessee Supreme Court addressed how due process considerations affect convictions for kidnapping and an accompanying felony. In that case, the Supreme Court held:

> [T]he legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

White, 362 S.W.3d at 562. Under this view, the Court concluded that the legislature intended to impose a kidnapping punishment only when "the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." Id. at 577. Consequently, the trial court must instruct the jury to determine whether the removal or confinement was essentially incidental to the accompanying felony or whether it was significant enough, standing alone, to support a conviction for kidnapping. Id. at 578. Such jury instruction is necessary to afford the defendant the proper constitutional due process protection. Id. Often, the proof can be interpreted different ways, and therefore, whether the removal or confinement constituted substantial interference with the victim's liberty is a question of fact for the jury to resolve. Id. at 579. Additionally, the Supreme Court set out a suggested jury instruction to be utilized in cases where kidnapping is charged with an accompanying felony, and that instruction was later included in the Tennessee Pattern Jury Instructions. Id. at 580-81; 8 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 8.03(a).[7]

---

[7] The White instruction is as follows:

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert

In this case, the Defendant does not dispute that the jury properly received the White instruction. Instead, he simply claims that the evidence was insufficient to support the jury's finding that the removal and confinement of Mr. Crawford had criminal significance beyond that necessary to consummate the aggravated robbery. However, the Defendant's argument fails to acknowledge that the jury's determination is a question of fact, which we will not disturb on appeal. See White, 362 S.W.3d at 579; Bland, 958 S.W.2d at 659; Cabbage, 571 S.W.2d at 835.

By convicting the Defendant of especially aggravated kidnapping, after having received a White instruction, the jury determined that the removal and confinement of Mr. Crawford was not essentially incidental to the offense of aggravated robbery. Moreover, viewing the evidence in a light most favorable to the State, the Defendant and his accomplice forced Mr. Crawford into his home at gunpoint, compelled him to lie on his living room floor, and tied him up. After they had completed the robbery, the Defendant and his accomplice threatened to kill Mr. Crawford unless he remained tied up on the living floor until he heard the truck leave. Mr. Crawford obeyed their instruction. By preventing Mr. Crawford from immediately getting up off the living floor, the Defendant and his accomplice prevented Mr. Crawford from summoning assistance and reduced their risk of detection. See White, 362 S.W.3d at 580-81. Therefore, we find that there is sufficient evidence to show that Mr. Crawford's removal and confinement had criminal significance beyond that necessary to consummate the aggravated robbery, see id. at 577, and we affirm the Defendant's conviction for especially aggravated kidnapping.

---

offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the cases, including, but not limited to, the following factors:

- the nature and duration of the victim's removal or confinement by the defendant;
- whether the removal or confinement occurred during the commission of the separate offense;
- whether the interference with the victim's liberty was inherent in the nature of the separate offense;
- whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeding in preventing the victim from doing so;
- whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
- whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

362 S.W.3d at 580-81.

## C. Consecutive Sentences

Finally, the Defendant argues that the trial court abused its discretion by ordering consecutive sentences for his especially aggravated kidnapping and especially aggravated robbery convictions. He claims the overall sentence does not reasonably relate to the offenses committed and is not the least severe measure to achieve the purposes of sentencing. Specifically, the Defendant contends that the trial court erred in considering the actions of his accomplice–namely, taunting and ultimately cutting the victim's neck with a box cutter–in finding that the Defendant was a dangerous offender. The State argues that the trial court did not abuse its discretion and consecutive sentences are reasonably related to the seriousness of the offenses. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. Id. at 554-55; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. Bise, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Id. at 709. Moreover, under those circumstances, this Court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The

trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2012).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2013).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114 (2013); see also Bise, 380 S.W.3d at 699 n. 33, 704; Carter, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

In the cases where the trial court orders consecutive sentences, the record must reflect at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b). State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). Any single ground is sufficient to support the imposition of consecutive sentencing. Id. at 862. As long as the reasons for ordering consecutive sentences are properly articulated, this Court will apply an abuse of discretion standard with a presumption of reasonableness on review. Id. However, when the trial court relies upon the dangerous offender classification to impose consecutive sentences, the trial court must also consider whether the evidence has established that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." State v. Wilkerson, 905 S.W.2d 933, 939

(Tenn. 1995). When the record fails to establish whether the trial court considered the Wilkerson factors, this Court may either "(1) conduct a *de novo* review to determine whether is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Pollard, 432 S.W.3d at 863.

In this case, the sentences imposed were within the appropriate ranges for the offenses. Additionally, the trial court properly articulated its reasons for imposing consecutive sentences and explicitly considered the Wilkerson factors as part of its determination that the Defendant is a dangerous offender. As such, we review for an abuse of discretion. See Pollard, 432 S.W.3d at 862.

In imposing consecutive sentences, the trial court found that Defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high" and that the defendant was on probation at the time of the offense. See Tenn. Code Ann. § 40-35-115(b)(4), (6) (2013). The record fully supports both findings by the trial court.

Regarding his status as a dangerous offender, the record reflects that the Defendant was actively involved in the incident; he approached Mr. Crawford with a gun and, with the help of his accomplice, forced Mr. Crawford into his home to be robbed. Additionally, as noted by the trial court, the Defendant is criminally responsible for his accomplice's actions of taunting Mr. Crawford and cutting his neck with a box cutter. Tenn. Code Ann. § 39-11-402(2) (2010); see State v. Russell Lenox Hamblin, No. M2008-02511-CCA-R3-CD, 2010 WL 4296674, at *7 (Tenn. Crim. App. Oct. 29, 2010) (affirming the defendant's consecutive sentences when the trial court found that the defendant was a dangerous offender based on the fact that the victims were sprayed with mace and the defendant's codefendant employed a handgun during the commission of the offense). Moreover, the evidence presented at trial showed that the Defendant sent multiple letters from jail in which he tried to prevent Mr. Crawford from testifying at the Defendant's preliminary hearing by threatening Mr. Crawford's life, accusing him of dealing drugs, framing him for kidnapping, robbery, and rape, and ultimately soliciting Mr. Crawford's murder. He even wrote detailed scripts for named individuals to use while carrying out his plans. The Defendant also threatened the recipients of the letters that he would accuse them of involvement in the crime if they did not carry out his wishes. Although the Defendant testified at the sentencing hearing that his time in jail had change him and if released he would stay out of trouble, the trial court specifically discredited his testimony. Additionally, the record reflects that the Defendant was on probation for robbery at the time of the offense. Therefore, we find that the trial court did not abuse its discretion when it ordered consecutive sentences for Counts 1, 2, and 4.

## III.  CONCLUSION

For the foregoing reasons, we affirm the trial court in part and reverse in part.

_____
ROBERT L. HOLLOWAY, JR., JUDGE